# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: DECEMBER 17, 2015
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2014-SC-000690-MR

DATE 1-7-16 Emit Grow.H, D.C.

ROMOCCO LAWARREN MALONE          APPELLANT

V.        ON APPEAL FROM FAYETTE CIRCUIT COURT
HONORABLE PAMELA GOODWINE, JUDGE
NO. 12-CR-01398

COMMONWEALTH OF KENTUCKY          APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**AFFIRMING IN PART, REVERSING IN PART, AND
REMANDING**

A Fayette County jury convicted Romocco Lawarren Malone of one count each of second-degree assault, first-degree burglary, second-degree stalking, and second-degree wanton endangerment; four counts of third-degree terroristic threatening; and of being a persistent felony offender in the first-degree (PFO I). Pursuant to the jury's recommendation, the trial court sentenced Malone to a total of 70 years' imprisonment on the felony convictions - 10 years for the assault and 20 years for the burglary with the assault sentence enhanced to 20 years and the burglary sentence enhanced to 50

years based on the PFO I conviction.[1]  On appeal, Malone argues that the trial court made seven reversible errors.  We agree that the court made one reversible error; therefore, we affirm in part, reverse in part, and remand.

## I. BACKGROUND.

Malone and Jessica Cruz, who had three children with another man, met late in the summer of 2011.  They began living together in Cruz's apartment shortly thereafter.  Cruz testified that the relationship was initially a good one; however, in October 2011, Malone became jealous of the father of Cruz's children and the couple argued.  According to Cruz, Malone threatened to kill the children's father and threatened her and one of her children with a knife.  The police were called; however, by the time the police arrived, Malone had fled and Cruz refused to press charges.  During the last two months of 2011, Malone continued to threaten and argue with the children's father, and Malone argued with, struck, and threatened Cruz several times.

On February 12, 2012, Malone became angry when Cruz received a phone call from another man.[2]  Malone again struck Cruz, knocking her to the floor.  He then got a knife and threatened Cruz with it.  The police were again called and they arrested Malone.  At the end of April, Malone was released from jail, and he and Cruz resumed their relationship.

---

[1] The stalking, wanton endangerment, and terroristic threatening convictions were for misdemeanors whose sentences the court ran concurrently with the felony sentences.

[2] Cruz testified that the man was not calling to talk to her but to talk to one of her friends.

On May 19, 2012, Cruz and Malone again argued and he pushed her against a table. Although there was no evidence presented as to causation, Cruz miscarried Malone's unborn child the next day. In July of 2012, Malone became upset because he thought Cruz was talking to a neighbor about him, and he threatened to hit Cruz in the face with a weight. In August, the couple again argued when Malone accused Cruz of sleeping with another man. The police were not called for any of the May through August events. At some point during this time frame, Malone moved into his own apartment and, according to Malone, he wanted to end his relationship with Cruz because he had found a new girlfriend, but Cruz kept contacting him. Cruz testified that she tried to end the relationship, but Malone would not leave her alone, and he was jealous because he believed she was with another man.

On or about September 13, Malone went to Cruz's place of work, took her cell phone, and threatened her. The police were called as a result of this incident, but Malone was not arrested. Throughout the evening and early morning of September 14-15, Malone and Cruz exchanged a number of text messages and phone calls. According to Cruz, Malone continued to harass her because he believed she was having a sexual relationship with another man. According to Malone, Cruz kept contacting him and Cruz's new boyfriend threatened him. At some point, the police were called and, while they were present in Cruz's apartment, Malone called. While speaking with the officers, Malone threatened to kill Cruz and the officers, and he said he would wait for the police at a nearby BP gas station. Two officers left to search for Malone,

3

leaving one officer, Officer Dearinger, outside of Cruz's apartment building. When the officers could not find Malone, they left. As Officer Dearinger was leaving, a cab driver flagged him down and reported that a passenger, who he had dropped off near Cruz's apartment, had not paid his fare. Officer Dearinger believed the passenger was Malone and returned to Cruz's apartment. When he entered the apartment, Officer Dearinger noticed that the door had been damaged and he heard Cruz screaming. Officer Dearinger then went to a bedroom, where he saw Malone lying on top of Cruz stabbing her. Officer Dearinger yelled to Malone to stop and threatened to shoot Malone. However, because of Malone's proximity to Cruz, officer Dearinger could not shoot him. Another officer then arrived, tazed Malone twice, and the officers arrested Malone and took him to jail.

On November 14, 2012, the grand jury indicted Malone for one count each of assault, burglary, stalking, unlawful imprisonment, harassment, and wanton endangerment and for multiple counts of terroristic threatening related to the events that occurred in mid-September 2012. The grand jury also indicted Malone for multiple counts of fourth-degree assault related to events that occurred in December 2011 and the summer of 2012. Finally, the grand jury indicted Malone for being a persistent felony offender in the first degree (PFO I).

Over Malone's objection, the court tried all counts in one proceeding, and the jury found Malone guilty as set forth above. We note that the Commonwealth dismissed the unlawful imprisonment and harassment

charges, and the jury found Malone not guilty of the fourth-degree assault charges that related to events in December 2011 and July 2012. We set forth additional background information as necessary below.

## II. STANDARD OF REVIEW.

The issues raised by Malone on appeal have different standards of review, which we set forth in our analysis of each issue.

## III. ANALYSIS.

### A. Kentucky Rule of Evidence (KRE) 404(b) Evidence.

"[W]e may reverse a trial court's decision to admit evidence only if that decision represents an abuse of discretion. And for a trial court's decision to be an abuse of discretion, we must find that the decision 'was arbitrary, unreasonable, unfair, or unsupported by sound legal principles.'" *Clark v. Commonwealth*, 223 S.W.3d 90, 95 (Ky. 2007) *quoting, Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

Prior to trial, the Commonwealth filed notice pursuant to KRE 404(c) that it intended to introduce evidence of a number of incidents of domestic violence for which Malone had not been charged in order to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident in accordance with KRE 404(b)(1)." The Commonwealth argued that the uncharged acts of domestic violence were inextricably intertwined with the charged acts, and their admission was necessary to show the complete picture of the couple's relationship. Malone objected arguing primarily that each of the uncharged incidents was a separate and distinct act, not part of an ongoing

5

pattern, and that they did not fall within any of the exceptions to 404(b)(1). Malone also argued that the charged crimes related to the incidents of September 14-15 should be tried separately from the charged crimes related to incidents preceding September 14-15. Following arguments by the parties on both motions, the court ruled that the evidence would be admissible to show the history of the relationship, which was relevant, and that the potential prejudice did not outweigh the probative value. Because the evidence was admissible, the court ruled that the crimes need not be tried separately. On appeal, Malone makes separate arguments regarding the admission of KRE 404(b) evidence and the joinder of the crimes in one proceeding; therefore, we address them separately.

As to the KRE 404(b) issue, Malone argues that the trial court erroneously permitted the Commonwealth to introduce evidence about the following six specific incidents of domestic violence. On October 2, 2011, Malone and Cruz argued, the police were called, but no charges were filed and Malone was not arrested. Cruz testified that, after this incident, she was afraid of Malone and their relationship changed.[3] On October 20, 2011, Malone became upset because Cruz was talking to the children's father. Malone got a knife, threatened to kill anyone who came to the apartment, and stabbed into a mattress. As Cruz was leaving the apartment with her children, Malone

---

[3] We note that the Commonwealth sought to introduce evidence that Malone assaulted Cruz's friend on October 2, 2011. However, despite the court's order permitting the introduction of that evidence, the Commonwealth later agreed to refrain from introducing any evidence of Malone's assault of this other person.

6

grabbed her son and threatened to kill him if Cruz did not return. Someone called the police and, before they arrived, Malone fled. On February 13, 2012, Malone got upset when a man called Cruz's phone. Malone hit Cruz and she fell, striking her head. Malone grabbed a knife but before he could do anything else, the police arrived and arrested him. On May 19, 2012, Malone pushed Cruz down and she had a miscarriage the next day. According to Cruz, Malone demanded that she have sex with him after she miscarried. Sometime in June or July 2012, Malone became upset because he thought Cruz was talking about him to a neighbor. Malone threatened to hit Cruz in the face with a weight. On August 25, 2012, Malone came to Cruz's apartment uninvited, and the two argued because Malone thought Cruz was having sex with another man.

Although there were two "sets" of charged crimes – the crimes related to events in December 2011 and July 2012 and the crimes related to events on September 14-15 – the parties focus primarily, if not exclusively, on whether the contested evidence was admissible with regard to the charged crimes associated with the events of September 14-15. However, for the sake of completeness, we address the admissibility of the above evidence with regard to each set of charged crimes separately.

KRE 404(b) provides that:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:

(1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or

(2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

The list of acceptable purposes for which KRE 404(b) evidence may be offered is not exclusive. *Tamme v. Commonwealth*, 973 S.W.2d 13, 29 (Ky. 1998), *as modified on denial of reh'g* (Sept. 3, 1998).

We start our analysis by noting that KRE 404(b) is a rule of exclusion and trial courts must apply the rule cautiously to prevent admission of such evidence simply to prove propensity to commit a crime. *Southworth v. Com.*, 435 S.W.3d 32, 48 (Ky. 2014), *reh'g denied* (Mar. 21, 2014), *as modified on denial of reh'g* (June 19, 2014). In making the determination to admit such evidence, the trial court must ask if the evidence is relevant for an acceptable purpose, *Bell v. Commonwealth*, 875 S.W.2d 882, 889-91 (Ky. 1994) and probative, *i.e.* is there "sufficient evidence that the 'other crime, wrong, or act' actually occurred[?]," *Meece v. Commonwealth*, 348 S.W.3d 627, 662 (Ky. 2011) *citing Commonwealth v. Davis*, 376 Mass. 777, 384 N.E.2d 181 (1978). Finally, the court must determine if the prejudicial impact of the evidence outweighs its probative value. *Bell*, 875 S.W.2d at 890. In this last element, the term "probative value" refers to the extent to which the evidence tends to prove the permissible purpose for which it is being offered.

8

### 1. *The September 14-15 Incidents.*

Looking at the *Bell* factors, we first note that evidence of the uncharged crimes was admissible regarding the September 14-15 incidents to show pattern, motive, and intent. As to pattern, the uncharged crimes showed that Malone assaulted Cruz when he believed she was involved with another man, a pattern evident in the events of September 14-15. Likewise, the prior assaults revealed that Malone had a consistent motive for assaulting Cruz, jealousy. Finally, as to intent, Malone argued that he was operating under extreme emotional distress on September 14-15 because of the argument with Cruz's boyfriend. The fact that Malone had assaulted Cruz on other occasions without having had an argument with another man is relevant to disprove his extreme emotional distress defense. *See Brown v. Commonwealth*, 983 S.W.2d 513, 516 (Ky. 1999), *as modified* (Jan. 27, 1999)("Evidence of collateral criminal conduct is admissible for purposes of rebutting 'a material contention of the defendant.'")(citation omitted). Thus, the Commonwealth has met the first *Bell* factor.

As to probativeness, there was more than sufficient evidence that the uncharged acts took place. Cruz testified about what happened on all of those other occasions; her friend and police officers verified some of the events took place; and Malone did not deny that any of the incidents occurred. Therefore, the Commonwealth met the second *Bell* factor.

As to whether the probative value of evidence of the uncharged crimes outweighed its prejudicial impact, we first note that Malone admitted that he

9

assaulted Cruz on September 14-15. Because Malone admitted that he committed the charged crime, evidence that he had previously committed uncharged crimes against the same victim has little prejudicial impact. Therefore, we cannot say that the trial court abused its discretion by finding that the probative value of the contested evidence outweighed its prejudicial impact.

### 2. *The Pre-September 14-15 Charged Crimes.*

We need not undertake a detailed analysis regarding admission of the uncharged crimes *vis-à-vis* the pre-September 14-15 crimes, because the jury found Malone not guilty of the pre-September 14-15 crimes. Therefore, even if it was error to admit evidence of the uncharged crimes *vis-à-vis* the pre-September 14-15 charged crimes, any error was harmless.

## B. Joinder of the Pre-September 14-15 Charges and the September 14-15 Charges.

As noted above, the trial court denied Malone's motion to sever the charges related to the pre-September 14-15 incidents from the charges related to the September 14-15 incidents. Kentucky Rule of Criminal Procedure (RCr) 6.18 provides that:

> Two (2) or more offenses may be charged in the same complaint or two (2) or more offenses whether felonies or misdemeanors, or both, may be charged in the same indictment or information in a separate count for each offense, if the offenses are of the same or similar character or are based on the same acts or transactions connected together or constituting parts of a common scheme or plan.

"Trial judges are vested with great discretion in determining whether to join or sever offenses, and this Court has consistently declined to disturb that

10

discretion absent a showing of clear abuse and actual prejudice." *Cherry v. Commonwealth*, 458 S.W.3d 787, 793-94 (Ky. 2015), *reh'g denied* (May 14, 2015)(citations omitted).

In making a determination to permit several offenses to be tried together, the trial court must guard against unduly prejudicing either party. In doing so, the court must assess "the risk that the evidence of one crime will be used inappropriately as evidence of another, or that the evidence will be used cumulatively, a strong case bolstering a weak one or . . . as proof of the defendant's criminal disposition." *Peacher v. Commonwealth*, 391 S.W.3d 821, 838 (Ky. 2013). "The primary test for determining whether joinder constitutes undue prejudice is whether evidence necessary to prove each offense would have been admissible in a separate trial of the other." *Roark v. Commonwealth*, 90 S.W.3d 24, 28 (Ky. 2002). Thus, the primary question in this case is whether evidence of the pre-September 14-15 incidents would have been admissible in a separate trial of the charges related to the September 14-15 incidents and *vice versa*.

As we previously held, evidence of Malone's uncharged pre-September 14-15 behavior was admissible with regard to the September 14-15 charges. For the same reasons, evidence related to the pre-September 14-15 charges would have been admissible in a trial of the September 14-15 charges. However, that does not end our analysis, which would normally require us to determine whether evidence of the September 14-15 charges would have been admissible in a separate trial of the pre-September 14-15 charges. The jury

11

returned not guilty verdicts on all of the pre-September 14-15 charges; therefore, any error in admitting evidence of the September 14-15 charges was harmless. For the foregoing reasons, we cannot say that the trial court abused its discretion by trying the pre-September 14-15 charges and the September 14-15 charges together.

## C. Terroristic Threatening Jury Instructions.

Malone was charged with four counts of terroristic threatening as a result of the incidents on September 14-15. One count involved Malone's threats to police officers, and that count is not part of this appeal. The other three counts involved Malone's threats to Cruz and all three instructions read as follows:

> You will find the Defendant, Romocco Lawarren Malone, guilty of Terroristic Threatening Third Degree under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:
>
> A. That in Fayette County, Kentucky, on or about September 15, 2012, and before the finding of the Indictment herein, he intentionally threatened to kill or cause serious physical injury to Jessica Cruz;
>
> AND
>
> B. That such act, if carried out, would have been likely to result in death or serious physical injury of Jessica Cruz.

Malone argues these three terroristic threatening instructions deprived him of a unanimous verdict because the instructions do not set forth sufficient facts to differentiate each count. The Commonwealth agrees, as do we.

Instructions must be based upon the evidence and they must properly and intelligibly state the law. *Howard v. Commonwealth,* 618 S.W.2d 177, 178

12

(Ky. 1981). When there are multiple counts of the same crime, the jury instructions must sufficiently differentiate each of the counts. *Harp v. Commonwealth*, 266 S.W.3d 813, 817 (Ky. 2008). Failure to do so is presumptively prejudicial. *Id.* at 818. Here, there is no way to tell what actions by Malone constituted any of the counts of terroristic threatening against Cruz. Therefore, we agree that those instructions were faulty and Cruz's convictions on those three charges must be reversed.

## D.   Prosecutorial Misconduct.

On direct examination, Malone admitted that he is an alcoholic and that he has issues with controlling his anger when he drinks. During cross-examination of Malone, the following exchange took place:

> Commonwealth:   We're talking about being an alcoholic and that's what adds to your anger. Were you drunk when you sat there yesterday and you called [Cruz's friend] a fucking bitch? Or [Cruz] a fucking bitch?
>
> Malone:     Do what?
>
> Commonwealth:   When you were sitting in that chair right there, and [Cruz] was testifying, and you turned to your attorney . . .
>
> Malone's Counsel:       Objection.
>
> Commonwealth:   . . . and you said . . .
>
> Malone:     Got that on video camera?
>
> Commonwealth:   I do.

At that point, the attorneys approached the bench and counsel for Malone stated that he had not heard either of those comments and that such questioning was improper. The Commonwealth's attorney then pointed

13

generally to the courtroom gallery and stated that several witnesses had overheard the comments and reported them to her. Malone's counsel then objected that the comments, even if they had been overheard, were irrelevant and protected by attorney-client privilege. The court stated that, to the extent the statements were overheard, the attorney-client privilege had been waived. The court then noted that whether alcohol was a factor had been raised by Malone on direct and that the question by the Commonwealth was therefore proper.

The Commonwealth then resumed questioning as follows:

Commonwealth: So you weren't drunk yesterday when you were sitting over there?

Malone: No response.

Commonwealth: Think it's funny?

Malone: No response.

Commonwealth: How about when you were staring at [Cruz's friend] today? Giving her looks like you've been giving me right now?

Malone argues that the Commonwealth violated its duty to "conduct trials in a fair manner" and this line of questioning violated that duty and amounted to reversible prosecutorial misconduct. The Commonwealth argues to the contrary.

> Prosecutors have a special role in the judicial system. Unlike other attorneys, "[a] prosecutor has the responsibility of a minister of justice and not simply that of an advocate." The sovereign, represented in a criminal trial by the prosecutor, has an interest "not that it shall win a case, but that justice shall be done." Although the Commonwealth is granted latitude in presenting its argument and raising objections, the prosecutor must nonetheless

14

"stay within the record and avoid abuse of defendants and their counsel." "While it is the duty of the prosecutor to advance the Commonwealth's case with persuasiveness and force, he or she has a concomitant duty not to derogate from a fair and impartial criminal proceeding."

*Caudill v. Commonwealth,* 374 S.W.3d 301, 309 (Ky. 2012)(citations omitted).

We agree with the Commonwealth that Malone, by testifying that he only became aggressive and violent when he drank, put his use of alcohol at issue. However, we disagree that the statements allegedly made by Malone to counsel are indicative of either aggression or violence. They may be indicative of animosity but animosity is not synonymous with aggression or violence and Malone's comments were not relevant to prove either aggression or violence. Furthermore, as we noted in *Caudill,* the prosecutor's sarcasm, as evidenced by her statement about Malone's "staring" "did not befit the 'mantle of power and respect' entitled to the office of a Commonwealth's Attorney[.]" *Caudill,* 374 S.W.3d at 312, *citing Niemeyer v. Commonwealth,* 533 S.W.2d 218, 222 (Ky.1976), *overruled on other grounds by Blake v. Commonwealth,* 646 S.W.2d 718 (Ky.1983). However, we cannot stop our analysis there.

[W]e must next determine what, if any, relief is warranted. This Court has held that "[a]ny consideration on appeal of alleged prosecutorial misconduct must center on the overall fairness of the entire trial." We reverse for prosecutorial misconduct only if the misconduct is "flagrant" *or* if each of the following three conditions is satisfied:

(1) Proof of defendant's guilt is not overwhelming;

(2) Defense counsel objected; and

(3) The trial court failed to cure the error with a sufficient admonishment to the jury.

15

*Caudill*, 374 S.W.3d at 312 (internal citations omitted).

There was overwhelming evidence of Malone's guilt. He admitted breaking into Cruz's apartment and to assaulting her; Cruz testified about the assault as did her friend; and two police officers observed Malone assaulting Cruz. Therefore, Malone failed to meet the first prong of the preceding test.

Furthermore, the Commonwealth's questioning of Malone about statements he made to counsel and about his "staring," while improper, did not rise to the level of flagrant misconduct. In determining whether a prosecutor's statements during closing argument rise to that level, we apply the following four factor test: (1) did the remarks mislead the jury or prejudice the accused; (2) were the remarks isolated; (3) were the remarks deliberately made; and (4) how strong was the evidence against the accused. *Hannah v. Commonwealth*, 306 S.W.3d 509, 518 (Ky. 2010). While the issue herein does not involve remarks by the prosecutor during closing argument, we believe the preceding test can be applied herein. Doing so, we note that two of the factors weigh in Malone's favor. The questions by the Commonwealth about Malone's statements to counsel and Malone's staring may have misled the jury and were prejudicial; and the questions were deliberate. However, the other two factors weigh in favor of the Commonwealth. The questions were isolated, taking up less than five minutes of a two day trial and, as noted above, the evidence of Malone's guilt was overwhelming. In light of the limited questioning of Malone and the overwhelming evidence of his guilt, we cannot say that the Commonwealth's conduct, while improper, was flagrantly so. Because Malone

16

has failed to show that the Commonwealth's conduct was flagrant and has failed to meet the requirements of *Caudill*, its conduct did not rise to the level of reversible misconduct.

**E.    Shackling.**

Following the presentation of testimony during the penalty phase of the trial, the court ordered that Malone be shackled while counsel gave their closing arguments. Malone's counsel objected and the court stated that it was "not personal" but "protocol" to shackle defendants during penalty phase closing arguments. When Malone stated that he had not been shackled during any of his prior trials, the court reiterated that shackling was protocol. Malone argues that he was denied a fair trial because he appeared before the jury in leg shackles during penalty phase closing arguments. The Commonwealth agrees with Malone that the trial court erred by having Malone shackled based on "protocol." However, the Commonwealth argues that this error was harmless.

RCr 8.28(5) provides in pertinent part that: "Except for good cause shown the judge shall not permit the defendant to be seen by the jury in shackles or other devices for physical restraint." We grant "a great deal of deference" to "a trial court's decision to keep a criminal defendant shackled before the jury[.]" *Barbour v. Commonwealth*, 204 S.W.3d 606, 614 (Ky. 2006). However, that discretion is not without limits and a decision by the trial court to shackle a defendant without "any substantive evidence or finding . . . that [a defendant] was either violent or a flight risk" is an abuse of that discretion. Id.

17

Here the only reason given by the court for having Malone shackled was that it was "protocol." This was an abuse of discretion and clear error. However, that does not end our analysis because this error "is subject to the harmless error rule." *Barbour*, 204 S.W.3d at 614. In *Barbour*, this Court applied the following standard for determining harmless error.

> Under RCr 9.24, we "must disregard any error or defect in the proceeding that does not affect the substantial rights of the parties." In light of this standard, we have held that "[t]he doctrine of nonprejudicial error, sometimes called 'harmless error,' is that in determining whether an error is prejudicial, an appellate court must consider whether on the whole case there is a substantial possibility that the result would have been any different."

*Id.*[4]

Malone, in his brief, outlined the law regarding when and why a defendant may be shackled. He also outlined from case law the problems shackling can cause such as: "detract[ing] from the dignity and decorum of the proceedings;" "imped[ing] the defendant's ability to communicate with counsel;" "confus[ing] and embarrass[ing] the defendant, thereby impairing his mental

---

[4] Following the *Barbour* opinion, this Court rendered *Winstead v. Commonwealth*, 283 S.W.3d 678 (Ky. 2009) altering the language in the standard for determining if an error is harmless as follows:

> A non-constitutional evidentiary error may be deemed harmless, the United States Supreme Court has explained, if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error. *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). The inquiry is not simply "whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." Id. at 765, 66 S.Ct. 1239.

*Winstead,* 283 S.W.3d at 688-89. Whether we apply *Barbour* or *Winstead,* the result is the same.

18

faculties;" and causing the defendant "pain." However, Malone did not state in his brief which of the preceding litany of potential problems he experienced as a result of being shackled; and he did not otherwise state how he was disadvantaged by being shackled. Malone attempted to remedy this in his reply brief by pointing out that he "received a sentence of 70 years," thus making the error harmful.

The problem with Malone's argument is two-fold. First, as noted above, the jury recommended sentences of 10 years for the assault conviction enhanced to 20 years based on the PFO I conviction and 20 years for the burglary conviction enhanced to 50 years based on the PFO I conviction. The jury could have recommended enhancing the burglary conviction to life in prison, which it chose not to do. Therefore, Malone, although he received a significant sentence, did not receive the maximum.

Second, as noted by the Commonwealth, during the penalty phase, the jury heard that Malone had previously been convicted of the following: unlawful imprisonment and wanton endangerment in 2011; first-degree robbery and first-degree burglary in 1995; two counts of first-degree trafficking in a controlled substance and tampering with physical evidence in 1995; first-degree facilitation to robbery in 1995; and three counts of first-degree trafficking in a controlled substance in 1990. Furthermore, the jury had heard in the guilt phase how Malone had continuously physically and verbally abused Cruz over a one year period and had broken her nose and stabbed her three times. Based on the preceding, there is no substantial possibility that the jury

19

was swayed by Malone wearing leg shackles when it imposed its sentence. Therefore, although it was error for the trial court to order Malone shackled based on protocol, that error was harmless.

## F. Voluntary Intoxication.

Malone argues that the trial court erred by not instructing the jury regarding voluntary intoxication because "[v]oluntary intoxication is a complete defense to crimes requiring intentional conduct." *Arnold v. Commonwealth,* 192 S.W.3d 420, 424 (Ky. 2006); KRS 501.080(1). Thus, if the jury had found that Malone was voluntarily intoxicated, it could not have found him guilty of first-degree burglary or second-degree assault, both of which require intent. The Commonwealth argues that the evidence did not support such an instruction.

"We begin our analysis by observing the well-settled principles that . . . 'it is the duty of the trial judge to prepare and give instructions on the whole law of the case ... [including] instructions applicable to every state of the case deducible or supported to any extent by the testimony[.]'" *Rogers v. Commonwealth,* 86 S.W.3d 29, 43 (Ky. 2002), *as modified* (Oct. 3, 2002)(footnote omitted). We review a trial court's determination not to give an instruction *de novo. Perdue v. Commonwealth,* 411 S.W.3d 786, 795 (Ky. Ct. App. 2013).

"A voluntary intoxication instruction is justified only when there is evidence that the defendant 'was so drunk that he did not know what he was doing,' or when the intoxication 'negatives the existence of an element of the

20

offense.'" *Rogers*, 86 S.W.3d at 44 (footnotes omitted). Malone testified that he had been drinking on September 14-15 and that he had passed out during the cab ride to Cruz's apartment. Cruz testified that Malone was intoxicated and one of the police officers testified that Malone was intoxicated; however, no one, not even Malone, testified that Malone did not know what he was doing. In fact, as the Commonwealth notes, two officers testified that they could not state whether Malone was intoxicated. Furthermore, Malone was able to testify in some detail about the events leading up to his assault of Cruz and that he went to Cruz's with the intent of killing Cruz's boyfriend. Therefore, the trial court correctly concluded that there was not sufficient evidence to support giving the jury a voluntary intoxication instruction.

## G.     Refreshing Recollection.

On September 14-15, Malone and Cruz sent numerous text messages to each other and spoke several times on the phone. The police were able to recover copies of the text messages Malone had sent but were not able to recover the message he received from Cruz or the messages Cruz sent. One of the assertions Malone made at trial was that he broke off the relationship with Cruz, and she kept harassing him in an attempt to rekindle the relationship. As proof of that assertion, Malone sought to introduce his text messages to Cruz. However, because introducing only Malone's text messages would have presented a skewed picture to the jury, and because there was no evidence how those messages were retrieved, the court refused to permit Malone to introduce them into evidence. The court did however permit Malone to testify about what

21

he remembered texting to Cruz. Malone's counsel then stated that he wanted to use the text messages to refresh Malone's memory, if necessary. The court reiterated that Malone could testify about what he remembered texting to Cruz; however, the court stated that Malone would not be permitted to read the messages verbatim into evidence. Malone now argues that the court refused to let him review the text messages to refresh his memory, thus impeding his ability to present a complete defense. We are not persuaded by this argument for five reasons.

First, contrary to Malone's argument, the court did not state that Malone could not review the text messages. The court stated that Malone could not read the messages into evidence.

Second, during Malone's testimony, counsel asked him if he remembered what he had texted to Cruz, and Malone stated that he did and that he had repeatedly texted Cruz asking her to stop bothering him. It is clear that Malone knew what was in the text messages, messages he repeatedly referred to during direct and cross-examination, and Malone had no lapse in his memory that needed to be refreshed.

Third, Malone did not dispute that he went to Cruz's apartment, broke down the door, broke Cruz's nose when he struck her in the face, and stabbed her. He has not shown how reviewing the text messages would have assisted him in refuting any of these facts.

Fourth, Malone has not shown how reviewing the text messages would have assisted him in proving his defense of extreme emotional distress, which

22

he said was triggered by his conversation with Cruz's boyfriend, not text messages from Cruz. Fifth, Malone has not shown how reviewing the text messages would have assisted him in proving his defense of intoxication. He admitted to being an alcoholic and to drinking daily, a pattern of behavior that was not altered by the text messages.

Thus, Malone has not shown how his reviewing the text messages would have altered the jury's findings, and we discern no error in the trial court's ruling.

## IV. CONCLUSION.

For the foregoing reasons, Malone's convictions of second-degree assault, first-degree burglary, second-degree stalking, second-degree wanton endangerment, one count of terroristic threatening, and of being a PFO I are affirmed. His convictions for the remaining three counts of terroristic threatening are reversed, and this matter is remanded to the trial court for entry of a consistent judgment and any additional proceedings the Commonwealth may pursue. We note that, because the sentences for those three convictions were ordered to run concurrently with Malone's other sentences, this reversal will have no impact on the amount of time Malone is required to serve.

Minton, C.J.; Abramson, Cunningham, Keller, Noble, and Venters, JJ., sitting. Minton, C.J.; Abramson, Keller, Noble, and Venters, JJ., concur. Cunningham, J., concurs in part and dissents in part by separate opinion. Wright, J., not sitting.

23

CUNNINGHAM, J., CONCURRING IN PART AND DISSENTING IN PART: I respectfully concur in part and dissent in part. The Commonwealth's concession of error on the instructions on the four terroristic threatening counts is not binding upon this court, nor dispositive of the issue. I concur in the excellent opinion of the Majority except for the reversal of the terroristic threatening counts because of faulty jury instructions. There was sufficient evidence of at least four counts of that charge, and therefore the identical instructions do not constitute reversal error. Therefore, I would affirm those convictions as well.

COUNSEL FOR APPELLANT:

Shannon Renee Dupree
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Jack Conway
Attorney General of Kentucky

Nathan Todd Kolb
Assistant Attorney General